**WAYNE GREENWALD, P.C.**  **THE WARSHAWSKY LAW FIRM**
**475 Park Avenue South**  **100 South Bedford Road, Suite 340**
**New York, New York 10016**  **Mt. Kisco, New York 10549**
**212-983-1922**  **914-514-2329**
**Wayne M. Greenwald**  **Steven M. Warshawsky**

**LAW OFFICE OF ANDREA**
**PAPARELLA, PLLC**  **Attorneys for Plaintiff-Creditor,**
**4 Dunlap Street**  **Andrea Paparella**
**Salem, MA 01970**
**Telephone: 617-680-2400**
**Facsimile: 914-462-3287**
**Email: amp@andreapaparella.com**
**Andrea Paparella**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X
In re                                                                    Chapter 7

**JEFFREY LEW LIDDLE,**                          Case No. 19-10747 (SHL)

                          Debtor.
------------------------------------------------------X
**ANDREA PAPARELLA,**                          Adv. Proc. No.

                          **Plaintiff,**                 **20-        (SHL)**

-against -

**JEFFREY LEW LIDDLE,**

                          **Defendant.**
------------------------------------------------------X

<u>**COMPLAINT**</u>

Plaintiff, Andrea Paparella "Plaintiff"), by her attorneys, represents:

1.    This action seeks judgments, pursuant to 11 U.S.C. § 523(a) determining that the Plaintiff's

claims against the Debtor, Jeffrey Lew Liddle (sometimes referred to as the

"Debtor") are not dischargeable nor discharged through this case.

## JURISDICTION AND VENUE

2.      On March 11, 2018, the Debtor filed a voluntary petition for relief under chapter 11, of title 11 U.S.C. § 101, *et seq.*, (the "Case").

3.      On June 22, 2020, this Court entered an order converting this case to a case under chapter 7 of the Bankruptcy Code.

4.      Angela G. Tese-Milner was appointed as the Chapter 7 trustee in this Case (the "Trustee").

5.      This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §§ 1334 and 157.

6.      This matter is a "core proceeding" as that term is defined by 28 U.S.C. § 157.

7.       This action concerns a "public right."

8.      This district is the appropriate district to consider this action, pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The Plaintiff consents to this Court entering a final judgment in this action.

10.     In January 2006, the Plaintiff became an associate attorney at Liddle & Robinson, L.L.P., ("L&R").

11.     The Debtor is the Founding Partner of L&R.

12.     Upon information and belief, the Debtor was and remains the controlling interest holder at L&R.

13.     The Debtor created L&R's "firm culture."

14.     The Debtor controlled L&R's "firm culture."

15.     Upon information and belief, the Debtor controlled L&R.

## **INTRODUCTION**

16.    This action concerns Plaintiff's tenure at L&R, and the Debtor's treatment of Plaintiff.[1]

17.    The Debtor treated Plaintiff less well than her male peers.

18.    The Debtor also treated Plaintiff less well than her non-Italian and non-Catholic peers.

19.    The Debtor made comments reflecting his gender bias, and his national origin and religious

       bias against Plaintiff.

20.    Among other things, the Debtor decided to pay Plaintiff less than lesser contributing male

       peers, non-Italian peers, and non-Catholic peers.

21.    Plaintiff departed from L&R on April 17, 2015.

22.    After Plaintiff's departure from L&R, the Debtor failed to pay Plaintiff owed compensation,

       which the Debtor acknowledged was owed to Plaintiff.

23.    Despite working at L&R for less than four months in 2015, Plaintiff was the highest

       originator of fees for L&R for 2015, after the Debtor, with no partner close behind her.

24.    After 2015, revenue Plaintiff generated continued flowing into the firm.

25.    The Debtor, however, paid Plaintiff $0 for this revenue he enjoyed.

26.    The Debtor's discrimination is particularly troubling given L&R's focus on employment

       law and representing plaintiffs who have been discriminated against.

### **In January 2006, Plaintiff Becomes An L&R Associate**

27.    In January 2006, Plaintiff became an L&R associate.

28.    Plaintiff had graduated from Cornell Law School in 2003.

29.    While Plaintiff was an associate at L&R, only one of L&R's ten partners was female.

---

[1] This Complaint does not include every single fact supporting Plaintiff's claims. She worked
there for years and to do so would be impractical.

30.     This female partner worked significantly less with associates than the other all male partners.

31.     The Debtor repeatedly denigrated this female partner and accused her of lacking commitment to the firm even though this female partner's work was always of a high quality.

32.     While she was an associate, the Debtor treated Plaintiff differently because of the Debtor's gender, national origin, and religion.

33.     As one example, when a certain male associate, James Halter, joined the firm after Plaintiff, the Debtor paid him more and assigned him what the Debtor considered more prestigious work.

34.     The Debtor paid Halter, who was male, not Italian and not Catholic, more and assigned him what he considered more prestigious work, even though Halter was less qualified than Plaintiff and did not have plaintiff-side employment experience.

35.     The Debtor also paid Plaintiff less than other less qualified male, non-Italian, and non-Catholic lawyers, including an associate who joined the firm after her, and was less qualified, also having no plaintiff-side employment experience.

36.     Similarly, less qualified male and non-Italian and non-Catholic attorneys enjoyed higher billing rates than Paparella at various times, but after enormous effort that was rectified (in part) and Paparella's rate did then surpass for example Halter's billing rate.

37.     The Debtor controlled the billing rates.

38.     The gender bias in billing rates was not limited to Plaintiff.

39.     At L&R derogatory language about female attorneys' appearance was used, including

toward Plaintiff.

40.     The Debtor suggested to Plaintiff that she get a "ladies makeover," in order to increase the

likelihood of her becoming an L&R Partner.

41.     When a hard working, dedicated female senior associate quit the firm because she wanted an

in-house position, the Debtor told lawyers at the firm that she really left because she wanted

to have a baby.

42.     Plaintiff is not aware of the Debtor ever commenting that male attorneys who left the firm

were leaving because they wanted to have a child.

43.     He referred to another hard-working, dedicated female associate in a derogatory way as a

"princess."

44.     He referred to another female attorney, outside of the firm. in a derogatory way as "Big

Mac."

45.     The Debtor repeatedly made gender based negative comments, including about female

opposing counsel.

46.     The Debtor invited male attorneys to social events without similarly extending such

invitations to female attorneys.

47.     On one occasion, a birthday cake for the Debtor depicting women's breasts was displayed

prominently in the kitchen for consumption.

48.     Plaintiff progressed and persevered through the years, despite the adverse working

conditions.

49.     The Debtor assigned Plaintiff more and more cases to handle, as if she was a partner.

50.     Plaintiff wholeheartedly worked on these matters assigned to her by the Debtor.

51.    The Debtor remarked, outside Plaintiff's presence, that Plaintiff repeatedly made "silk purses out of sows' ears."

52.    As an associate at L&R, Plaintiff was given more responsibility than her male peers.

53.    While an associate at L&R, Plaintiff was handling cases as would a partner.

54.    Plaintiff did not receive compensation or title commensurate with her work and responsibilities.

55.    One male associate griped that he too wanted responsibility comparable to the responsibilities placed on Plaintiff.

56.    This male associate told Plaintiff that he had asked the Debtor if he too could have case responsibility like Plaintiff.

57.    The Debtor responded: "You are not [Plaintiff]," and said that Plaintiff was devoted to her work over everything else in life, and remarked that she might "regret it one day."

58.    The Debtor was apparently referencing his belief that Plaintiff was prioritizing work over marriage and children.

59.    Plaintiff is not aware of the Debtor ever commenting that male attorneys may regret dedicating themselves to work.

60.    Plaintiff continued to build her business.

61.    Plaintiff began originating significant fees—even more than most of the partners each originated.

62.    Plaintiff accomplished this through extreme hard work and many hours.

63.    Plaintiff had a uniquely difficult position of handling a partner's caseload, along with an associate caseload that included duties to other L&R partners.

64.     The Debtor had Plaintiff handling cases that generated fees similar to those of male partners, but with vastly less resources than male L&R partners, and while the Debtor paid her significantly less than male partners.

65.     Male partners actively sought to undermine Plaintiff, including to associates. Male partners repeatedly worked to stop associates from working with Plaintiff.

66.     The Debtor created, and supported, the hostile work environment Plaintiff worked in.

67.     While enjoying the revenue Plaintiff brought in, the Debtor supported the myth at L&R that Plaintiff's cases were less valuable to L&R.

### The Debtor Tells the Plaintiff She Is On Partner Track

68.     By 2010, the Debtor began telling Plaintiff she was on track to soon be a partner at L&R.

69.     The Debtor told Plaintiff not to tell Halter.

70.     The Debtor said Halter was not on track for becoming partner.

71.     Time passed without Plaintiff's promotion to partner.

72.     The Debtor indicated a lack of partner support for her promotion.

73.     While the Debtor frequently commended Plaintiff's work to other L&R partners, they worked against her promotion.

74.     Examples follow.

75.     After Plaintiff single-handedly settled a case as an associate for over $1,000,000—a relatively significant amount for the firm—the Debtor announced it at a partners' meeting.

76.     Rather than congratulate the Plaintiff, immediately after the meeting she was berated by a male partner.

77.     That male partner suggested that Plaintiff misappropriated origination credit.

78.   In fact, another partner, not Plaintiff, was the designated originator.

79.   Plaintiff merely handled the case for this other lawyer.

80.   Plaintiff's $1,000,000 plus settlement as an associate was not the only relatively large settlement she obtained as an associate.

81.   She had multiple settlements that she handled without partners that settled for relatively significant amounts for the firm, well above average settlements achieved by partners, other than the Debtor.

82.   Each year, Plaintiff consistently generated substantial revenue on cases she originated and led.

83.   Each year, Plaintiff consistently generated substantial revenue on cases she was assigned to work on with partners.

84.   The collective inferior treatment of Plaintiff by L&R and certain L&R partners was regular, and rampant.

85.   For example, there was a mediation, held in L&R's conference center, where Plaintiff was her client's sole attorney.

86.   Plaintiff was in a private room with the female mediator and her female client, when a male L&R partner barged into the room, demanding that Plaintiff go to the male partner's office for another matter.

87.   The female mediator objected to this.

88.   The client was not happy with the event she witnessed, either.

89.   Plaintiff never attended a mediation with a comparable disruption.

90.   Male attorneys routinely disrupted Plaintiff's work, in similar ways.

-8-

91.   For example, a male L&R partner directed an associate, en route to a deposition in a case Plaintiff was handling, to return to the office.

92.   Another male L&R partner inserted himself, late in the case, to take credit for Plaintiff's work.

93.   Another male L&R partner was visibly bothered whenever he saw an associate in Plaintiff's office.

94.   That L&R partner did not want Plaintiff working with associates, even though Plaintiff was doing so with the Debtor's authority.

95.   Certain L&R male partners repeatedly misrepresented to the Debtor, throughout the years, that Plaintiff was misusing associate time.

96.   Certain L&R male attorneys directed associates not to perform work for Plaintiff and demeaned her cases and practice.

97.   This was absurd given that her revenue and contribution to the firm were dramatically higher than certain L&R male attorneys who were demeaning her cases and practice.

98.   This was a common misrepresentation made about Plaintiff and promulgated by certain L&R male attorneys.

99.   While still an associate, functioning as a partner and an associate, Plaintiff repeatedly told associates to prioritize partners' work, and the Debtor's work, first before hers.

100.  The objective numbers—the associates' hours—show that this common tale was fictional.

**Plaintiff Becomes Partner In July 2012**

101.  Plaintiff became a partner in July 2012.

102.  Plaintiff's promotion to partner took much longer, in terms of graduating law school class,

than the two males previously made partner.

103. The Debtor informed Plaintiff that the one other female partner spoke on Plaintiff's behalf, encouraging her promotion to partner.

104. Other L&R male partners apparently opposed it, including one that, through the years, repeatedly commended Plaintiff's work, and staffed her on high profile matters.

105. When Plaintiff learned she was becoming an L&R partner, she learned that a less accomplished associate, Halter, was also being promoted.

106. Halter told Plaintiff he was surprised by his promotion.

107. Plaintiff, however, had for years been waiting for her promotion.

108. Plaintiff was working for her promotion since the time the Debtor told her she was on track.

109. The Debtor told Plaintiff to campaign for it, due to the objection of certain L&R male partners.

110. While Plaintiff waited, she declined another firm's offer.

111. Not long before Plaintiff's July 2012 promotion, the Debtor suggested that Plaintiff socialize more with the partners in the office.

112. Plaintiff replied she frequently socialized with colleagues, and told the Debtor that if her male colleagues did not then support her promotion, they never would.

113. This was a grueling process for Plaintiff that Halter escaped, enjoying a pleasant surprise of promotion to partner.

114. The circumstances support the conclusion that Halter was made partner because it would have been embarrassing to have a female, who graduated law school after him, made partner and not him, and that had Halter been female he would not have been made partner.

-10-

115.    On the day of her promotion, the Debtor promised Plaintiff that she would be paid more than Halter.

116.    Plaintiff would have left L&R firm if she was to earn less than Halter.

117.    The Debtor told Plaintiff she would be paid more than all the other partners, based on the compensation formula.

**Halter Receives Substantially More Compensation Than Plaintiff**

118.    In 2013, Halter was paid substantially more than Plaintiff, and the one other female partner.

119.    Plaintiff complained to the Debtor, and expressed the gender bias.

120.    The Plaintiff was privy to each partner's compensation per the Schedule K-1.

121.    The Debtor nonetheless was adamant that the Debtor had not paid Halter more.

122.    The Debtor claimed that Halter was paid the same as Plaintiff, and that another L&R partner decided to pay Halter "premium" pay for a case.

123.    This "premium" was not legitimate.

124.    Even if it was, Halter should not have been paid the "same" as the Plaintiff before the "premium" payment, which the Debtor has decided to do.

125.    The Debtor told Plaintiff that L&R had an agreed compensation formula to be followed for pay.

126.    This formula is corroborated by the Form K-1 Plaintiff received.

127.    According to the Form K-1, Plaintiff was paid pursuant to a "FORMULA," and she received a certain percentage of "Total Distributive Shares."

128.    One factor of the formula was fee origination.

129.    That year, Halter originated far less than Plaintiff—about 1% of what Plaintiff originated.

130. In addition to the continued disparate pay, Plaintiff's promotion to partner did not stop L&R male partners from thwarting her work and marginalizing her.

131. Another example of L&R's disparate gender treatment is the L&R's website promotion.

132. In October 2013, a male L&R partner worked to create a website announcement that all of L&R's male partners had been selected to "SuperLawyers."

133. It was known that the announcement omitted Plaintiff's selection.

134. Plaintiff complained of this gender bias.

135. It was never corrected.

136. Plaintiff's gender-based complaints were widely known by L&R's partners, including by the Debtor.

137. Similarly, L&R's website otherwise made female achievements invisible.

138. For example, L&R recognized male associate contributions on its website.

139. When a female associate was recognized on L&R's website, the Debtor ordered the recognition deleted.

140. Plaintiff was vacationing when this "SuperLawyers" website slight happened.

141. During Plaintiff's trip she suffered other negative gender-based treatment.

142. Plaintiff requested junior associate assistance to close a settlement deal.

143. The Debtor's policy was to expediently close such deals.

144. Plaintiff required a minor amount of associate time to do minor editing to a simple settlement agreement.

145. Halter, however, ordered that the junior associate not perform this work for Plaintiff.

146. Plaintiff emailed the Debtor who overrode Halter's command and ordered the male

associate to complete the work the Plaintiff assigned.

147.   This type of behavior against Plaintiff was constant.

148.   After a certain male partner yet again ordered an associate from Plaintiff's office, this time a female associate, Plaintiff spoke to him. She told him he should consider the appearance of pulling a female associate out of a meeting with one of the firm's two female partners. This partner than reported Plaintiff's complaint about him to the Debtor.

149.   The Debtor telephoned Plaintiff about the complaint.

150.   The Debtor was furious in his telephone call to Plaintiff.

151.   He told Plaintiff not to speak about discrimination again.

**In 2014, Plaintiff's Compensation Improves And The Debtor Decides To Pay Her On The Higher End Of The Pay Spectrum**

152.   For 2014, Plaintiff was paid more than Halter, and indeed paid on the higher end of the pay spectrum.

153.   The other female partner, however, was unfairly paid less than her male peers, and paid at the lowest end of the spectrum.

154.   This female partner, like Plaintiff, has an Italian surname.

155.   Only Plaintiff and this female partner had Italian surnames.

156.   This female partner had been a partner for years more than Halter who was paid more than her.

157.   While Plaintiff's pay increased, certain L&R male partners continued their campaign against her.

158.   It was a constant struggle that hindered Plaintiff's and L&R's success.

159.    Certain L&R male partners continued misinforming the Debtor that Plaintiff was using associate time more than other partners.

160.    The objective evidence proved otherwise.

161.    While the Plaintiff routinely attended depositions, mediations, and court conferences alone, certain L&R male partners had heavily staffed matters, including on matters of the same or lesser value than those Plaintiff handled.

162.    Nonetheless, Plaintiff had significant achievement in 2014, which L&R should have applauded as it was good for L&R too.

163.    In November 2014, favorable results in cases Plaintiff was handling and had originated were announced in outside coverage.

164.    That month, however, the Debtor verbally attacked Plaintiff in another male partner's office.

165.    The Debtor's attack was triggered by the lies and negative treatment that certain L&R male partners continued propagating, and the firm's precarious financial position.

166.    A male associate was leaving the firm and tri-state area.

167.    At his exit interview, according to the Debtor he apparently had told the Debtor that Plaintiff was good at training and explaining (this was not the only associate to say this about Plaintiff).

168.    This associate's departing compliment apparently made the Debtor believe the accusation by some male partners that Plaintiff was overusing associates.

169.    Upon information and belief, the Debtor surmised that because this associate had complimented Plaintiff's training, Plaintiff had worked with him too much.

170.    The Debtor went on during this attack to compare Plaintiff to being like "Mary Poppins" in

-14-

one sentence, saying just because she made things fun did not mean she was doing it right. In the next sentence the Debtor referred to Plaintiff as a "bull," forcing things her way.

171.    These two sentiments are contradictory and gender-biased.

172.    The Debtor asked Plaintiff, during this attack, if it was because she was Italian that she needed to be "so dramatic," when she was not being "dramatic."

173.    While Plaintiff's negative experience at L&R is largely based on her identity as a woman, there is support that the Debtor treated her less well because of her national origin and religion.

174.    The Debtor previously said in front of Plaintiff that as a plaintiff you do not want to have "Irish Catholics or people with Italian surnames on the jury because they have a ghetto mentality – if they can't have it they don't want you to have it."

175.    The Debtor said you never want a juror whose last name ends with a vowel, a common characteristic of Italian surnames.

176.    Plaintiff objected to the Debtor's gender based and national origin-based attacks.

177.    It became clear to Plaintiff, during this November 2014 attack, that the firm was in a precarious financial position.

178.    Plaintiff offered the Debtor to loan L&R hundreds of thousands of dollars in cash, which the Debtor rejected.

179.    Around this same time the Debtor became irate with Plaintiff for marking herself on a New Matter Sheet as the originator of a case that she had indeed originated.

180.    The Debtor then re-assigned the matter so that the Debtor oversaw it with another L&R male partner reporting to the Debtor.

-15-

181.   That L&R male partner then tried to get Plaintiff to continue working on the case, without credit, in an associate role.

182.   This was not the first time the Debtor treated Plaintiff less well than her male peers regarding origination credit. While Liddle admitted to Plaintiff of gifting origination credit to a male partner, the Debtor previously deprived Plaintiff of full origination credit and forced her to split it with the Debtor when she alone deserved the credit.

183.   Around this time, the Debtor said to a male partner that Plaintiff, the youngest partner, was "fat," "ugly," and "middle aged."

184.   The Debtor also said about Plaintiff that "you cannot manage that woman."

185.   The Debtor was not the only one to make sex-based comments.

186.   The Debtor concluded falsely, at this time, that Plaintiff was planning to leave L&R, perhaps at someone else's suggestion.

**In 2015, Plaintiff Was Poised To Originate Even More Fees**

187.   In 2015, Plaintiff was on track to originate more fees than ever before.

188.   The Debtor's and L&R's gender-based disparate, less well treatment, however, was as bad as ever.

189.   In Plaintiff's final period at L&R, a high fee for L&R was due to come in from a case Plaintiff originated and worked on with no other L&R partner.

190.   A settlement agreement had already been signed by the parties at issue.

191.   It was beyond Plaintiff's control to expedite the fee's arrival at L&R.

192.   Plaintiff repeatedly explained this to the Debtor.

193.   The Debtor was furious that the fee Plaintiff generated, without any other Partner's

assistance, had not arrived.

194.    The Debtor had another L&R male partner demean Plaintiff by serving as a messenger

between Plaintiff and Debtor over the issue.

195.    This meant that the male partner would routinely question Plaintiff about the fee's arrival.

196.    Plaintiff explained it was beyond her control.

197.    This male partner would then report Plaintiff's response to the Debtor.

198.    Plaintiff was criticized for this situation, even though nothing could be done to make the fee

arrive earlier.

199.    In her final days at L&R a female associate was directed not to work on Plaintiff's cases at

all, anymore.

200.    Similar instructions were being given to other associates.


**<u>On April 17, 2015, Plaintiff Begins Her Own Firm</u>**

201.    On Wednesday, April 15, 2015, the Debtor walked into Paparella's office late in the day and

said, "It's either you or me, and it's not going to be me," and told her he wanted her "out by

Friday."

202.    Plaintiff said ok.

203.    The Debtor then offered Plaintiff referrals for starting a new firm.

204.    The Debtor referred a banker, a real estate broker, and a legal malpractice insurance broker.

205.    Plaintiff declined these referrals.

206.    The Debtor then expressed anger to another partner, saying, "well Paparella doesn't need

my help."

207.    At least two partners told the Debtor he should give Plaintiff months of notice; instead, the

Debtor told Plaintiff late on a Wednesday that he wanted her "out by Friday."

208. The decision came when: (1) large fees were expected that Plaintiff had originated; and (2) L&R needed funds and would rather soon default on loan obligations.

209. Just before this ouster, when a female associate told Plaintiff that a male L&R partner told her she was not to work on any of Plaintiff's matters, Plaintiff told the associate that decision was the Debtor's alone.

210. Plaintiff also, exasperated that this was happening in a year she was set to generate more revenue than any other partner other than the Debtor (and did so for L&R despite not being there after April 2015), told the associate that this directive was unfair; that she knew how many associate hours she used compared to others; and that she did not use more than her fair share).

211. Plaintiff also tried to utilize associates who were not being utilized and had low caseloads, to avoid this constant obstruction from certain male partners.

212. During her years at L&R Plaintiff never witnessed male attorneys having associate support abruptly ripped away.

213. This was a common practice with respect to Plaintiff.

214. The Debtor never during Plaintiff's tenure ordered any other L&R partner to leave for a non-performance reason. The only other partners who left during the Debtor's tenure were not forced to leave.

215. When the Debtor considering forcing Halter to leave, the Debtor held a special meeting with two male partners and Halter to discuss Halter's behavior and how he had to correct it, and then did not force Halter to leave.

-18-

216.    On April 16, 2015, Plaintiff's mother was scheduled to visit her daughter from Massachusetts.

217.    This was an extremely difficult time for Plaintiff who was suffering enormous emotional distress and turmoil and operating out of the office of the firm she worked at prior to L&R.

218.    Plaintiff's distress caused enormous distress to her mother, who was very worried about her daughter.

219.    This would be Plaintiff's mother's last visit, as she unexpectedly died about two months later.

220.    On April 17, 2015, Plaintiff began her own firm.

221.    The Debtor acknowledged that Plaintiff was owed further compensation, but never paid her this owed compensation.

222.    Plaintiff was never paid for revenue in 2015 and prior periods.

223.    Additionally, the Debtor initially expressed that L&R would not pursue fees from cases where clients followed Plaintiff.

224.    This changed, and L&R and other male partners, including the Debtor, did pursue fees for cases where clients followed Plaintiff.

225.    The days and weeks that followed were brutal.

226.    Plaintiff had the heaviest case load of all the partners and now she had to operate with no attorney support.

227.    In the immediate aftermath of her departure, Plaintiff acted honorably. The Debtor did not.

228.    For example, Plaintiff had just settled one matter and the client strenuously wanted to transfer his matter to Plaintiff.

229.   Plaintiff, however, encouraged him to stay at L&R, as his matter had largely concluded but for a finalized written agreement.

230.   The Debtor promised to pay Plaintiff a portion of this fee, but never did.

231.   The Debtor and L&R did not pay Plaintiff for the time she spent while no longer at L&R speaking to this client about staying at L&R.

232.   Thus, she worked for free.

233.   Plaintiff had multiple settlements at the time of her departure, where monies were still due.

234.   The Debtor and L&R never paid Plaintiff these fees.

235.   The Debtor never provided Plaintiff her contacts.

236.   Plaintiff lost most of the work product she had amassed through thousands of hours, and the ability to stay in touch with former clients and work contacts.

237.   The Debtor and L&R provided extensive severance pay to male attorneys who contributed much less than Plaintiff, and with extensive notice of termination.

238.   Plaintiff received no severance.

239.   Instead Plaintiff effectively paid the Debtor and L&R, to avoid her clients being sued for fees.

240.   No longer at L&R, Plaintiff continued, for years, to pay L&R fees to which they were not entitled.

241.   The Debtor and L&R engaged in no meaningful transition of Plaintiff's cases, despite Plaintiff's request to the Debtor for an appropriate transition.

242.   This rendered L&R and the Debtor barred from demanding fees from clients who rightfully followed Plaintiff.

243. Days after she was forced to leave, Plaintiff had a mediation for an attorney client, and she was thwarted in preparing for it.

244. In other cases, the Debtor and L&R held on to client files to the detriment of the clients.

245. Plaintiff was obstructed from obtaining basic information regarding cases that she was handling at her new firm.

246. Plaintiff agreed to share substantial fees with L&R, rather than risk L&R suing her client for fees.

**The Attempt To Steal Plaintiff's Largest Fees**

247. The Debtor and L&R then tried to steal Plaintiff's likely largest fees.

248. Letters were sent to Plaintiff's clients explaining they could choose to stay at L&R or become clients of Plaintiff.

249. Letters were not sent for three certain matters.

250. For one of these matters, L&R refused to sign a proposed Consent Order Granting Substitution Of Counsel, that in early May Plaintiff and her client had signed and sent to L&R. L&R also failed to transfer the file. This was not the only file L&R failed to transfer, hindering Plaintiff's work for clients.

251. It was not until June 26, 2015, days after Plaintiff's mother, enormously stressed over her daughter's departure from a firm she had dedicated herself to for so long, had unexpectedly died and days after Plaintiff had moved into a permanent space, that L&R sent a letter to Plaintiff, falsely asserting that the "matter was completed . . . other than the receipt of payment."

252. L&R and the Debtor were claiming entitlement to the entire fees (other than co-counsel's

share) and stated they would only transfer the client's file to Plaintiff when they obtained the
"outstanding check." This was an incongruous position. If the matter was truly over (it was
not), then there would be no need for Plaintiff to have the client's voluminous file.

253.    Indeed, it was not true that the "matter was completed."

254.    This case did not actually conclude until 2017—years later.

255.    In L&R's and the Debtor's campaign to steal Plaintiff's compensation, when Plaintiff
directed her co-counsel not to transfer fees to the Debtor but to hold the money in an escrow
account until a Court decided who was entitled to the fees, the Debtor threatened
disciplinary action against the Plaintiff and her co-counsel.

256.    For the second of these matters, L&R declared "there is little additional attorney work to be
done on this matter. All that remains is to see if [Client] is going to receive a share of a
recovery. As all of the work for this matter was completed through Liddle Debtor &
Robinson and no work would be required by the Law Office of Andrea Paperella, PLLC,
should there be a recovery, Liddle & Robinson should still receive any such recovery and
distribute as it would have prior to your departure."

257.    More remained to be done on this matter as well.

258.    The matter did not conclude until 2017.

259.    For both of the above matters, Plaintiff, had she still been at L&R, would have been entitled
to the elusive "premium" pay that only male partners ever enjoyed, and was based not on
total revenue brought into L&R each year, but rather a lottery like system where if one
single case resulted in a fee that was a substantial certain amount higher than the hourly fee
value on the case, "premium" pay would result.

-22-

260.   As the Debtor was the ultimate decision maker for case assignments and had to approve
       each assignment, he greatly determined who was positioned for premium pay.

261.   After Plaintiff's departure, the Debtor expressed fear that Plaintiff would take the best
       performing associates with her.

262.   This discredits an earlier accusation the Debtor made (not to Plaintiff) that the reason he told
       Plaintiff she must leave was because of associate demand for it.

263.   When a female associate regarded as L&R's best performing associate left, she explained
       she was joining a large, national firm.

264.   The Debtor remarked that he believed she was not joining such a firm and was going to
       work with Plaintiff.

265.   That associate did not go to work for Plaintiff's firm.

266.   When another high performing female associate later left L&R, the Debtor made the same
       remark.

267.   That associate did not go to work for Plaintiff's firm.

**For 2015, Despite Her Departure, Only The Debtor Originated More Fees For L&R Than
Plaintiff**

268.   For 2015, despite being at L&R for less than four months, Plaintiff originated more fees for
       L&R than any other partner other than The Debtor.

269.   No one was close behind her.

270.   L&R never paid Plaintiff her owed compensation for these fees, despite the Debtor's
       recognition that Plaintiff was owed these fees.

271.   In August 2015, L&R, upon information and belief, at the Debtor's suggestion, then had the

audacity to propose that Plaintiff work on L&R matters where L&R would enjoy a "referral fee of 25%." Given New York's prohibition against "referral fees," Plaintiff assumed L&R meant a work sharing arrangement. Plaintiff declined the offer.

272.    In the years following 2015, L&R and the Debtor enjoyed fees which Plaintiff originated while at L&R, without compensating her.

273.    The Debtor also disparaged Plaintiff, to longstanding business relations of hers who were contemplating further business with Plaintiff.

274.    Plaintiff represented one in a matter as an associate and achieved a settlement of approximately $750,000.

275.    Plaintiff no longer enjoys this relationship.

**After Plaintiff's Departure, L&R Hired Two Men With Guaranteed Compensation Higher Than Plaintiff Ever Received**

276.    After the Plaintiff's departure, L&R soon hired two men as Counsel and guaranteed them compensation higher than L&R had ever paid Plaintiff.

277.    One hiree was a longstanding colleague of an L&R male partner, who co-counseled matters with him.

278.    Upon information and belief, that L&R male partner initiated this hiree's tenure at L&R.

279.    Upon information and belief, the Debtor initiated the other hiree's tenure at L&R.

280.    This was in a time of financial crisis for L&R.

281.    Upon information and belief, while L&R paid each of these two men more than Plaintiff had ever been paid, their combined origination revenue was less than the Plaintiff's 2015 origination revenue.

-24-

282.    Upon information and belief, the Debtor decided these two men's pay.

283.    Shortly after hiring these men, L&R promoted a male associate, less qualified than Plaintiff,

to partner.

284.    This made worse the ratio of male to female attorneys in senior positions at L&R.

285.    Upon information and belief, the Debtor initiated this male attorney's promotion.

**Violation Of New York City Human Rights Law, § 8-107(1)(a)**

286.    Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

287.    The Debtor is an "employer" under § 8-102(5) of the New York City Human Rights Law.

288.    The Debtor treated Plaintiff less well because of her gender, among other things, paying her

less and not paying her at all.

289.    The Debtor and L&R treated the Plaintiff maliciously and less well because of her religion

and national origin.

290.    Plaintiff is therefore entitled to punitive damages.

291.    As a result of the Debtor's actions, Plaintiff suffered significant damages, including lost

wages and benefits and emotional distress, in amounts to be determined at trial, but not less

than $32,305,000.

292.    As a result of the Debtor's unlawful conduct, the Debtor is also liable for Plaintiff's

attorneys' fees and costs.

**Unlawful Retaliation Under the New York City Human Rights Law, § 8-107(7)**

293.    Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

294.    The Debtor is an "employer" under § 8-102(5) of the New York City Human Rights Law.

295.    Plaintiff engaged in protected activity under the New York City Human Rights Law by complaining.

296.    The Debtor retaliated against Plaintiff for engaging in protected activity.

297.    Upon information and belief, the Debtor engaged in this retaliatory conduct with malice and reckless indifference to the Plaintiff's protected rights.

298.    Plaintiff is therefore entitled to punitive damages under the New York City Human Rights Law.

299.    As a result of the Debtor's actions, Plaintiff has suffered substantial damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial, but not less than $32,305,000.

300.    As a result of the Debtor's unlawful conduct, the Debtor is liable for Plaintiff's attorneys' fees and costs.

**Interference With Protected Rights Under The New York City Human Rights Law, § 8-107(19)**

301.    The Debtor's actions violated § 8-107(19) which states:

> Interference with protected rights. It shall be unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise of enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

**Violation of New York City Human Rights Law, § 8-107(13)(b)**

302.    The Debtor is liable to the Plaintiff under § 8-107(13)(b), which states:

-26-

An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

   (1)    The employee or agent exercised managerial or supervisory responsibility; or

   (2)    The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where the conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

   (3)    The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

303.   The Debtor knew of the discriminatory conduct, and acquiesced in such conduct and failed to take immediate and appropriate corrective action.

## Violation Of New York Labor Law: Sections 191, and 198(c)

304.   The Debtor violated the New York Labor Law by depriving Plaintiff of owed compensation, including commission pay and vacation pay.

305.   When Plaintiff complained to the Debtor of the failure to pay her owed commission pay, the Debtor and L&R retaliated against her.

306.   As a result of the Debtor's violations of the New York Labor Law, Plaintiff has suffered damages by failing to receive her lawful wages.

307.   The Debtor's and L&R's actions in failing to compensate Plaintiff in accordance with the NYLL were not in good faith.

308.   In addition to the unpaid wages, Plaintiff is entitled to liquidated damages, prejudgment

interest, and attorneys' fees, all to be determined at trial, but not less than $32,305,000.

## Fraud

309.    The Debtor represented to Plaintiff that L&R based its compensation on a formula.

310.    The Debtor represented that the formula included factors such as hours worked and fee origination.

311.    Plaintiff relied on the Debtor's representation.

312.    Plaintiff's reliance on the Debtor's representation was reasonable.

313.    Upon information and belief, the Debtor intended for Plaintiff to rely on the representation.

314.    The representation was false.

315.    Upon information and belief, the Debtor knew his representation to Plaintiff was false.

316.    By reason of the Debtor's false representation, Plaintiff provided money, property and/or services to the Debtor.

317.    By reason of the Debtor's false representation, Plaintiff provided money, property and/or services for the Debtor's benefit.

318.    The Debtor obtained the benefit of Plaintiff's money, property and/or services through the false pretenses, a false representation, or actual fraud described above.

## Breach Of Fiduciary Duty

319.    Plaintiff had a fiduciary relationship with the Debtor.

320.    The Debtor owed Plaintiff fiduciary duties.

321.    These fiduciary duties included, but are not limited, to: (i) a duty of full disclosure; (ii) a duty to refrain from acting "malevolently" or in "bad faith," solely for their own gain, and in

a manner not contemplated by their agreement; (iii) a duty to exercise an "extreme measure of candor, unselfishness, and good faith;" (iv) a duty not to act for the aggrandizement or undue advantage of themselves to the exclusion or detriment of Plaintiff; (v) a duty of loyalty; and (vi) a duty not to engage in oppressive actions towards Plaintiff.

322.    The Debtor and L&R engaged in misconduct with respect to Plaintiff.

323.    The Debtor and L&R's wantonly, intentionally, and maliciously breached the fiduciary duties they owed Plaintiff.

324.    Rather than act in good faith and with "extreme candor and unselfishness," the Debtor and L&R, among other things, failed to pay Plaintiff any compensation due her for her contributions in 2014, 2015, and beyond; deprived her of "premium" pay; and took actions intentionally designed to cause Plaintiff severe financial, and career harm.

325.    Plaintiff suffered damages directly caused by the Debtor's conduct.

326.    The Debtor's conduct caused Plaintiff substantial economic injury.

327.    Plaintiff is entitled to damages against the Debtor in an amount to be determined at trial.

### Violation Of New York Equal Pay Act New York Labor Law § 194

328.    The Debtor is obligated to disgorge his unjust gains and provide restitution to Plaintiff with the value of her services, plus interest and costs, all in amounts to be determined at trial, but not less than $32,305,000.

329.    Because of Plaintiff's gender, the Debtor caused L&R to pay Plaintiff less than her male peers for equal work that required equal skill, effort, and responsibility, and was performed under similar working conditions.

330.    Because of Plaintiff's gender she was paid less, even when she performed greater work that

-29-

required more skill, effort, and responsibility, and was performed under worse working conditions.

331.    The Debtor retaliated against Plaintiff for complaining of pay disparity.

332.    The Debtor caused Plaintiff damages, in an amount to be determined at trial, but not less than $32,305,000.

**Tortious Interference With Contractual Relations**

333.    Plaintiff had a valid contract with L&R.

334.    The Debtor knew about that contract.

335.    The Debtor intentionally and improperly procured a breach of that contract.

336.    The breach caused Plaintiff damages, in an amount to be determined at trial.

**Tortious Interference With Prospective Business Relations**

337.    Plaintiff had profitable business relationships that the Debtor knew about and intentionally interfered with using "dishonest, unfair, improper [and] wrongful means," causing Plaintiff damages.

338.    Plaintiff had a reasonable probability of entering further business relationships with parties.

339.    The Debtor acting solely out of malice and by using improper means and breaching his fiduciary duty, interfered with Plaintiff's business relationships by disseminating false and misleading and malicious information to Plaintiff's existing relationships about Plaintiff and why she was no longer at L&R.

340.    By his intentional tortious conduct, the Debtor caused Plaintiff financial damage.

341.    Upon information and belief, the Debtor intended to injure Plaintiff in the manner she was

injured.

342. The Debtor's tortious conduct was willful, wanton, and malicious and as such warrants the imposition of punitive and exemplary damages.

343. Accordingly, Plaintiff is entitled to award of damages against the Debtor, of all damages flowing from the tortious conduct set forth above, plus interest, costs, and all other damages to be determined at trial.

## FIRST CLAIM FOR RELIEF - 11 U.S.C. § 523(a)(2)(A)

344. Plaintiff repeats the allegations stated in paragraphs numbered "1" through "343" of this Complaint with the same force and effect as if stated fully here.

345. The Claim is based on the Debtor obtaining money, property, or services from Plaintiff.

346. The Debtor obtained money, property, or services from Plaintiff.

347. The Debtor obtained money, property, or services from Plaintiff by inducing Plaintiff to enter an employment relationship with L&R.

348. The Debtor obtained money, property, or services from Plaintiff by inducing Plaintiff to enter a partnership relationship with L&R.

349. The Debtor obtained money, property, or services from Plaintiff by inducing Plaintiff to bring business to L&R.

350. The Debtor obtained money, property, or services from Plaintiff by inducing Plaintiff to bring revenues to L&R.

351. The Debtor obtained money, property, or services credit from Plaintiff through the Debtor's false pretenses, false representations, and actual fraud.

-31-

352. The Debtor obtained money, property, or services credit from Plaintiff through the Debtor's false pretenses, false representations, and actual fraud which induced the Plaintiff to become an associate at L&R.

353. The Debtor obtained money, property, or services credit from Plaintiff through the Debtor's false pretenses, false representations, and actual fraud which induced the Plaintiff to become a partner at L&R.

354. The Debtor's false pretenses, false representations, and actual fraud were not statements respecting the Debtor's or an insider's financial condition.

355. By reason of the foregoing, the Court should enter a judgment determining that, pursuant to 11 U.S.C. § 523(a)(2)(A) Plaintiff's Claims against the Debtor are not dischargeable and cannot be discharged through the Debtor's Case.

## SECOND CLAIM FOR RELIEF - 11 U.S.C. § 523(a)(4)

356. Plaintiff repeats the allegations stated in paragraphs numbered "1" through "353" of this Complaint with the same force and effect as if stated fully here.

357. Plaintiff's claims against the Debtor result from the Debtor's fraud or defalcation against Plaintiff while the Debtor was acting in a fiduciary capacity with respect to Plaintiff.

358. Plaintiff's claims against the Debtor result from the Debtor's embezzlement or larceny against Plaintiff.

359. By reason of the foregoing, the Court should enter a judgment determining that, pursuant to 11 U.S.C. § 523(a)(4) Plaintiff's Claims against the Debtor are not dischargeable and cannot be discharged through the Debtor's Case.

## THIRD CLAIM FOR RELIEF - 11 U.S.C. § 523(a)(6)

360.    Plaintiff repeats the allegations stated in paragraphs numbered "1" through "357" of this Complaint with the same force and effect as if stated fully here.

361.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff was injured through the Debtor's fraud and fraudulent conduct.

362.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff was injured through the Debtor's conduct which violated the New York City Human Rights Law, § 8-107(1)(a).

363.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff was injured through the Debtor's conduct which constituted unlawful retaliation under the New York City Human Rights Law, § 8-107(7).

364.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff was injured through the Debtor's conduct which violated the New York City Human Rights Law, § 8-107(19).

365.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff was injured through the Debtor's conduct which constituted a violation of the New York City Human Rights Law, § 8-107(13)(b).

366.    Upon information and belief, the Debtor intended Plaintiff to be injured in way Plaintiff was injured through the Debtor's conduct which constituted a violation of the New York Labor Law §§s 191, and 198( c ).

367.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff

was injured through the Debtor's conduct which constituted a violation of the New York Labor Law § 194.

368.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff was injured through the Debtor's conduct which tortiously interfered with Plaintiff's contractual relations.

369.    Upon information and belief, the Debtor intended Plaintiff to be injured in the way Plaintiff was injured through the Debtor's conduct which tortiously interfered with Plaintiff's prospective business relations.

370.    Upon information and belief, the Debtor intended to obtain and used Plaintiff's money, property, and/or services through a fraudulent scheme described in this Complaint.

371.    Upon information and belief, the Debtor's conduct was sufficiently grave that it was performed with actual malice.

372.    Upon information and belief, the Debtor's conduct was aggravated and socially reprehensible.

373.    The Debtor's conduct against Plaintiff was malicious.

374.    Plaintiff's injuries resulted from the Debtor's malice.

375.    By reason of the foregoing, the Court should enter a judgment determining that, pursuant to 11 U.S.C. § 523(a)(6), Plaintiff's claims against the Debtor are not dischargeable and cannot be discharged through the Debtor's Case.

    **WHEREFORE,** Plaintiff asks that this Court enter judgment in Plaintiff's favor and against the Debtor, as follows:

    a.)      First Claim for Relief: judgment determining that, pursuant to 11 U.S.C. §

523(a)(2)(A), Plaintiff's Claims against the Debtor are not dischargeable and cannot
be discharged through the Debtor's Case;

b.)   Second Claim for Relief: judgment determining that, pursuant to 11 U.S.C. §
523(a)(4), Plaintiff's Claims against the Debtor are not dischargeable and cannot be
discharged through the Debtor's Case;

c.)   Third Claim for Relief: judgment determining that, pursuant to 11 U.S.C. §
523(a)(6), Plaintiff's Claims against the Debtor are not dischargeable and cannot be
discharged through the Debtor's Case;

d.)   awarding Plaintiff her costs, disbursements, and attorneys' fees in prosecuting this
action; and

e.)   granting such other and further relief as the Court deems proper.


Dated: Becket, MA
     September 28, 2020

WAYNE GREENWALD, P.C.           Steven M. Warshawsky
475 Park Avenue South           THE WARSHAWSKY LAW FIRM
New York, New York 10016      100 South Bedford Road, Suite 340
212-983-1922                Mt. Kisco, New York 10549
                          914-514-2329

By: __/s/ Wayne M. Greenwald__   Pres.
     Wayne M. Greenwald


Andrea Paparella
LAW OFFICE OF ANDREA PAPARELLA, PLLC
4 Dunlap Street
Salem, MA  01970
Phone: 617-680-2400         *Attorneys for Plaintiff-Creditor,*
Facsimile: 914-462-3287      *Andrea Paparella*

,

-35-